**STATE of Missouri ex rel Chris KOSTER, Relator,**

v.

**The Honorable Daniel GREEN, Circuit Judge of Cole County, and Marilue Hemmel, Circuit Clerk Cole County Circuit Court, Respondents.**

No. WD 75820.

Missouri Court of Appeals, Western District.

Dec. 26, 2012.

Michael J. Spillane, Jefferson City, MO, for relator.

Ameer Gado and Daniel F. Harvath, St. Louis, MO, for respondents.

Before Writ Division: CYNTHIA L. MARTIN, Presiding Judge, JOSEPH M. ELLIS, Judge and MARK D. PFEIFFER, Judge.

CYNTHIA L. MARTIN, Judge.

This is an original proceeding in certiorari to review the record in the case of *Allen v. Dormire,* Circuit Court of Cole County, Missouri, Cause No. 11AC–CC00634. In that case, the Honorable Daniel Green ("habeas court") issued a writ of habeas corpus to George Allen Jr. ("Allen") on November 2, 2012.

Allen was convicted in July 1983, following a second jury trial in the Circuit Court of St. Louis City of capital murder, rape,

sodomy, and first degree burglary in connection with the February 4, 1982 murder of Mary Bell in her apartment in St. Louis, Missouri.[1] Allen was sentenced to life imprisonment without the possibility of parole for fifty years and to three consecutive terms of fifteen years' imprisonment in the Missouri Department of Corrections. Allen's conviction was affirmed on appeal. *State v. Allen*, 684 S.W.2d 417 (Mo.App. E.D.1984).

The writ of habeas corpus vacated Allen's conviction and commanded that Allen be released from custody should the City of St. Louis Circuit Attorney's Office indicate within ten days its intent not to retry Allen. The Circuit Attorney's Office so indicated and the habeas court issued its order conditionally releasing Allen on his own recognizance on November 14, 2012.[2]

The Attorney General for the State of Missouri ("Attorney General") filed a petition for writ of certiorari on November 14, 2012. We granted the writ of certiorari as a matter of right. *State ex rel. Nixon v. Kelly*, 58 S.W.3d 513, 516 (Mo. banc 2001); *State ex rel. Taylor v. Blair*, 357 Mo. 586, 210 S.W.2d 1, 3–4 (1948).

■ We refuse to quash the record of the habeas court.[3]

## Procedural History

Allen filed a petition for writ of habeas corpus in the Cole County Circuit Court[4] on September 26, 2011, pursuant to Missouri Supreme Court Rule 91. A first amended petition was filed on February 17, 2012, and was thereafter supplemented on March 2, 2012, and June 28, 2012 (collectively, hereinafter, "Petition").

Allen's Petition asserts three claims. First, Allen claims that the State failed to disclose exculpatory, material evidence in violation of his right to due process pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("Claim No. 1"). Second, Allen claims that the undisclosed evidence, and newly discovered exculpatory evidence, combine to demonstrate that his prosecution resulted in a miscarriage of justice under *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210 (Mo. banc 2001) ("Claim No. 2"). Third, Allen claims that he has presented clear and convincing evidence of innocence ("actual innocence") under *State ex rel. Amrine v. Roper*, 102

---

1. Allen's first trial on the same charges resulted in a hung jury.

2. The writ of habeas corpus dissolved and vacated Allen's judgment of conviction returning him to the status of a pretrial detainee. *See Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Allen thus remains a charged suspect in Mary Bell's murder eligible for retrial. *See State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 549 (Mo. banc 2003) ("As the evidence was sufficient at Amrine's first trial to convict, however, there is no double jeopardy bar to retrial, if the state believes it can produce enough evidence ... to once again bring [the] case to [the] jury.").

3. "In certiorari, this Court is limited to either quashing or not quashing the record of the lower court." *State ex rel. Nixon v. Jaynes*, 61

S.W.3d 243, 246 n. 1 (Mo. banc 2001). An appellate opinion quashing or not quashing the record of a habeas court does not, strictly, affirm or deny the writ of habeas corpus, and thus does not implicate Rule 91.04(a)(4) or Rule 91.22. *Id.*

4. The Cole County Circuit Court possessed personal jurisdiction over the habeas proceedings, as Allen was incarcerated in Cole County, Missouri. Rule 91.02(a). The Cole County Circuit Court had subject matter jurisdiction over the habeas proceedings pursuant to Mo. Const. art.V, section 14(a), which affords circuit courts in Missouri original (albeit non-exclusive) jurisdiction over remedial writs.

S.W.3d 541 (Mo. banc 2003) ("Claim No. 3").

On July 16, 2012, cross motions for summary judgment were filed by Allen and the Attorney General. The cross motions were each supported by a joint statement of uncontroverted material facts ("Stipulated Facts").

After considering the Stipulated Facts, Judge Green issued a writ of habeas corpus on November 2, 2012 ("Judgment") which included seventy-five pages of findings of fact and conclusions of law. The findings of fact were cross-referenced to the Stipulated Facts. The Judgment granted Allen habeas relief on Claim No. 1, and purported not to reach or determine Claims No. 2 or No. 3.

■ We issued our writ of certiorari on November 15, 2012. "A writ of certiorari requires an inferior court to produce a certified record of a particular case for review for irregularities." *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 231 (Mo.App. W.D.2011). We ordered the Circuit Court of Cole County to return the record of the habeas corpus proceedings to this court for review.[5]

---

5. We subsequently amended the writ of certiorari to require only the certification and delivery of the Stipulated Facts as the Judgment was entered in exclusive reliance on the Stipulated Facts. The Attorney General's suggestions in support of the petition for writ of certiorari candidly emphasized this court's ability to exercise its discretion to dispense with portions of the writ procedure (including delivery of the complete record) in the interest of justice. Rule 84.22. The Attorney General's candor is in keeping with what the habeas court observed was the Attorney General's cognizance of his role as "a minister of justice and not simply that of an advocate." [Judgment, p. 4]. We echo the habeas court's commendations of the Attorney General, and note with respect and appreciation the honorable and appropriately balanced attention the Attorney General's office has afforded to both its duties to prosecute violations of Missouri

## Standard of Review

Certiorari is "available to correct judgments that are in excess or an abuse of jurisdiction,[6] and that are not otherwise reviewable [on] appeal." *State ex rel. Nixon v. Sprick*, 59 S.W.3d 515, 518 (Mo. banc 2001). Our review is limited to whether the habeas court exceeded the bounds of its authority to grant habeas relief *or* abused its discretion in issuing the writ of habeas corpus. *State ex rel. Koster v. Jackson*, 301 S.W.3d 586, 589 (Mo.App. W.D.2010).

In applying this standard of review, we do not review findings of fact. *Sprick*, 59 S.W.3d at 518. We limit our review to questions of law presented by the record before the habeas court. *Id.* The habeas court will have exceeded the bounds of its authority if the evidence as a whole does not support the grant of a writ of habeas corpus in light of the applicable law. *Id.* "[E]very lawful intendment will be made in favor of the determination and the regularity of the proceedings below." *State ex rel. Shartel v. Skinker*, 324 Mo. 955, 25 S.W.2d 472, 478 (1930). The habeas court will have abused its discretion if its "ruling is clearly against the logic of the circum-

---

law and its duties to Missouri citizens to operate the office with character, integrity, and a commitment to ethical advocacy.

6. Prior to the Missouri Supreme Court's decision in *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249 (Mo. banc 2009), Missouri cases spoke in terms of a habeas court's "jurisdiction" to afford habeas relief. *See, e.g., Jaynes*, 61 S.W.3d at 245 ("The chief purpose of certiorari is to confine an inferior court within its jurisdiction."). It is clear following *Webb* that we are to review whether the habeas court exceeded its authority or abused its discretion, and not whether it exceeded its "jurisdiction." *See State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 231 (Mo.App. W.D.2011); *State ex rel. Koster v. Jackson*, 301 S.W.3d 586, 589 (Mo.App. W.D.2010).

stances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Stewart,* 313 S.W.3d 661, 665 (Mo. banc 2010).

Upon the completion of our review, our options are to "either quash the writ or [to] uphold the actions of the habeas court," *Jackson,* 301 S.W.3d at 589, "in whole or in part." *State ex rel. White v. Swink,* 241 Mo.App. 1048, 256 S.W.2d 825, 827 (1953).

## Analysis

The habeas court granted Allen habeas relief on the basis of Claim No. 1. The habeas court thus concluded that the State failed to disclose exculpatory, material evidence in violation of Allen's right to Due Process pursuant to *Brady* and *Kyles.* The undisclosed evidence on which the habeas court relied to reach this conclusion consisted of serological test results, police documents referencing serological test results, documents concerning fingerprints

found at the crime scene, a drawing of the crime scene made by Allen, and the fact that a key prosecution witness had been hypnotized.

The Attorney General's petition for writ of certiorari does not claim that Allen was procedurally barred to assert Claim No. 1 in his habeas petition, and thus does not claim that the habeas court exceeded its authority to entertain Claim No. 1. We dispense, therefore, with discussion of the extent to which a habeas court has the authority to entertain claims raised in a habeas corpus petition that are procedurally barred because they could have been asserted on direct appeal or in a post-conviction proceeding.[7] We instead accept the habeas court's uncontested conclusion that Allen's Claim No. 1 (his *Brady* claim), though procedurally barred, was nonetheless reviewable pursuant to the gateway of "cause and prejudice" recognized by the Missouri Supreme Court in *Jaynes,* 63 S.W.3d at 215.[8]

7. For a thorough discussion of the claims cognizable in a habeas corpus proceeding, and of the exceptions permitting review of procedurally defaulted claims, *see McElwain,* 340 S.W.3d at 243–45.

8. Claim No. 1 was treated by the habeas court as falling within the "cause and prejudice" exception to overcoming procedural default in a state habeas proceeding. [Judgment, p. 40]. *See State ex rel. Nixon v. Jaynes,* 63 S.W.3d 210, 215 (Mo. banc 2001) (citing *Schlup v. Delo,* 513 U.S. 298, 315, 332–34, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). "The United States Supreme Court explained that the 'cause' of procedural default 'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.' " *Id.* (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). "To establish the 'prejudice' necessary to overcome procedural default, a petitioner ... bears the burden of showing, not merely that errors at his trial created the possibility of

prejudice, but that they 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Id.* at 215–16 (quoting *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). The gateway of cause and prejudice permits a habeas court to reach the merits of an otherwise procedurally barred claim. *Amrine,* 102 S.W.3d at 546 ("A showing either of cause and prejudice or of actual innocence acts as a 'gateway' that entitles the prisoner to review on the merits of the prisoner's otherwise defaulted constitutional claim[s]."). Though the habeas court stated in its Judgment that it was not reaching or determining Claim No. 2, in reality, the habeas court did reach and determine that claim in part, as it is in Claim No. 2 that Allen asserts the basis for the habeas court's authority to entertain the procedurally defaulted *Brady* claim raised in Claim No. 1. However, the habeas court did not consider "new evidence" in finding the gateway of cause and prejudice had been established, though invited by Allen to do so in Claim No. 2. *See* discussion, *infra,* at footnote number 16.

The Attorney General's petition for writ of certiorari concedes that evidence in the categories described, *supra,* was not disclosed to Allen. In fact, the Stipulated Facts concede as much, presenting this court with the somewhat unusual scenario wherein the Attorney General's independent investigation of Allen's habeas claims has persuaded the Attorney General to stipulate that Allen was denied access to evidence prior to his trial which should have been made available to him.

The sole issue the Attorney General has asked this court to review is "the legal issue whether the prejudice resulting from the failure to disclose the evidence rises to the level of Due Process Clause violations" under *Brady* and *Kyles.* [Suggestions in Support of Petition for Writ of Certiorari, p. 2]. Specifically, the Attorney General asks us to determine whether "it was an abuse of discretion to find prejudice rising to the level of [a] Due Process Clause violation from the failure to disclose evidence in this case." [Suggestions in Support of Petition for Writ of Certiorari, p. 3]. Given the narrow issue presented in the Attorney General's writ petition, we thus need only determine whether the habeas court's finding that Allen established a *Brady* violation "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Stewart,* 313 S.W.3d at 665.

### The Essential Elements of a Brady Claim

■ To prevail on a *Brady* claim, a movant "must show each of the following: (1) the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) he was preju-

diced." *State ex rel. Engel v. Dormire,* 304 S.W.3d 120, 126 (Mo. banc 2010).

■ To determine "whether ... evidence meets the test for *Brady* prejudice, this Court must assess whether the evidence at issue is material to [Allen's] case." *Id.* at 128.

The materiality standard for *Brady* claims is established when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435 [115 S.Ct. 1555]. ***"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial ... resulting in a verdict worthy of confidence."*** *Id.* at 434 [115 S.Ct. 1555].

*Id.* (emphasis added). If there is a " 'reasonable probability' " that the outcome of a criminal proceeding would have been different, then the evidentiary suppression " 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). If materiality is established by this standard, then " 'the suppression ... violates due process ... irrespective of the good faith or bad faith of the prosecution.' " *Merriweather v. State,* 294 S.W.3d 52, 54 (Mo. banc 2009) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. 1194). Moreover:

In the context of whether [a defendant's] *Brady* claims are barred procedurally from habeas review, prejudice is identical to this Court's assessment of prejudice undertaken in assessing [a defendant's] *Brady* claims. Consequently, so long as [a defendant] establishes the prejudice to support his *Brady* claims, he will have shown the required preju-

dice to overcome the procedural bar for habeas relief.

*Engel,* 304 S.W.3d at 126.

Following our review of the evidence which yielded Allen's conviction, and our review of the undisclosed evidence, we determine that the habeas court's conclusion that the undisclosed evidence could reasonably be taken to put Allen's whole case in such a different light as to undermine confidence in his verdict was not an abuse of discretion.

### The Evidence at Trial [9]

On January 31, 1982, a snow storm began in St. Louis, and by February 4, the snow in the LaSalle Park neighborhood of St. Louis was knee deep, or an estimated 20 inches. In the morning of February 4, Mary Bell was murdered in her LaSalle Park apartment. Pamela Ann Richardson (formerly Pamela Harrison), a work colleague of Ms. Bell's, spoke with Ms. Bell at her home by phone between 10:00 and 10:15 a.m. and made arrangements for Richardson to come by Ms. Bell's home to pick up work materials. By the time Richardson arrived between 10:30 and 10:45 a.m., the perpetrator was already inside Ms. Bell's apartment. On the evening of February 4, Ms. Bell was discovered dead in her apartment by her live-in boyfriend, Russell Watters. Police were called to the scene. Ms. Bell's body lay face-down in the bedroom between the bed and a bedroom wall. She was naked.

The bedding was disheveled and spotted with blood. A white nightgown lay on the bed. A pair of jeans was found lying on the floor along the bedroom's east wall with other items of clothing, including another pair of pants. Downstairs in the foyer closet near the apartment's front door, the police found a Styrofoam cooler containing a bloody knife wrapped in a towel. In the kitchen, the police found Ms. Bell's robe on the floor between a director's chair and a staircase leading to the apartment's third floor. Ms. Bell had told Richardson when they spoke by phone that morning that she had just gotten out of the shower and was putting on her robe.

The autopsy showed that the cause of death was multiple stab and incised wounds to the victim's back and neck. The victim had a total of 14 stab wounds to her back, including six that penetrated through the entire body and exited the body though her chest, and five deep incised wounds to her neck. The autopsy also revealed evidence consistent with sexual assault. The victim's vagina was free of trauma, but her anus had several superficial lacerations with bleeding into the surrounding tissue. The medical examiner noted other injuries indicative of sexual assault, including several abrasions over the lower back consistent with fingernail marks, and circular contusions over the right upper thigh.

Kirk Eaton was an initial suspect in the murder. Eaton had recently been released from prison after serving time following a rape conviction, and had been spotted by a police officer in the area of Ms. Bell's apartment complex. Eaton's brother lived in the same complex as Ms. Bell. Eaton himself resided five or six blocks away from Ms. Bell at the time of the murder, and disappeared shortly after Ms. Bell was murdered.

On the morning of March 14, 1982, George Allen was walking several blocks away from Ms. Bell's home when he was

9. With minor and immaterial exception, our recitation of the evidence at trial is taken directly from the Judgment, which itself borrows heavily (and generally verbatim) from the Stipulated Facts. For the sake of readability, we have deleted the record references included by the parties in the Stipulated Facts and by the habeas court in the Judgment.

stopped by Officers Terry James and Mark Burford. The officers stopped Allen because they thought that he matched Eaton's description. There had also been a rash of rapes committed in the area in the early morning hours by a man in his twenties with a shaved head. Allen had his head shaven at the time that he was stopped by police. Officers later observed that Allen had his entire body shaved, including his eyebrows and pubic hair, at the time he was stopped. Allen was and is mentally ill and has been diagnosed with schizophrenia, among other disorders. Allen produced several documents bearing his name, but because he did not have a driver's license, the officers arrested Allen and brought him to the police station to verify that he was not Eaton.

Officer James contacted Pam LaRose in the police Sex Offenses division and advised her that they had a subject that matched the description of the man wanted for rapes in the area. Officer LaRose testified that she interviewed Allen for approximately half an hour in connection with these rapes. During the interview, Allen said that he had previously forced women to have sex with him who had pushed him away, and then denied that he had done so. He specifically told Officer LaRose that he had committed rapes in "the apartment building on 14th," then said that he had not committed such rapes. Officer LaRose testified that "Well I didn't feel I had enough evidence for—to book him on anything. He couldn't give me names, exact locations or anything else. I just terminated the interview with him." Officer LaRose never further pursued Allen as a suspect in the crimes she was investigating.

Officer James also contacted Detective Herbert Riley of the Homicide Division. Detective Riley led the Homicide Division squad of the St. Louis Police Department which was assigned to investigate Ms. Bell's case. Detective Riley was assigned to investigate the Bell homicide on February 5, 1982. Detective Riley testified that he was able to determine that Allen was not Eaton. Detective Riley nonetheless decided to interrogate Allen regarding the murder of Ms. Bell. This interrogation eventually ended with Allen's taped confession, in which Allen admitted to raping and murdering Ms. Bell.

Detective Riley testified at the suppression hearing in connection with Allen's first trial that he questioned Allen for 15–20 minutes before showing Allen photos of Ms. Bell's apartment, and that Allen became a suspect when he responded affirmatively when asked whether he had been in the area of Ms. Bell's apartment during the time of the deep snow. Detective Riley testified that he then advised Allen of his rights and turned on the cassette recorder to tape his interrogation, during which Allen confessed.

Detective Riley testified at Allen's second trial that during his interview with Allen prior to the recording, he did not discuss the crime with Allen or provide him with any details. At the beginning of the recording, Detective Riley introduced the questioning by stating that Allen "is a man who may or may not have information relative to this incident." But Detective Riley also testified that prior to the recording he discussed Allen having forced his way into the victim's home on the day of her murder. Detective Riley also testified that prior to the recording, he showed Allen a photo of a vase and lamp (which also showed the frame of Ms. Bell's brass bed in the background) from the crime scene and told Allen that the police had fingerprints from the crime scene so that Allen would believe that police had found his prints.

Allen testified at a suppression hearing prior to his second trial that he was interrogated for two to three hours before the recording began, during which time police fed him facts and details about the crime and repeatedly threatened and hit him. Allen testified that during this pre-recording interrogation, he told officers that he was innocent and knew nothing about the crime. He also told officers about his psychiatric problems and prior hospitalization. The recording of the interrogation shows that Allen further informed Detective Riley that he was under the influence of alcohol during the interrogation. Allen testified that he ultimately was convinced by the police that they had evidence against him, that his protestations of innocence were futile, and that he had no choice but to falsely confess.

The entirety of the recorded confession was played at trial. The recorded portion of the interrogation reflects that Detective Riley often used closed-ended questions that incorporated some of the details about the crime in the questions. For example:

a. Detective Riley showed Allen pictures of the victim's apartment building and her front door and directly asked Allen whether he had ever been to that location.

b. Detective Riley directly asked Allen if he anally raped the victim after Allen stated he had only had vaginal intercourse with the victim, asking Allen "Did you stick it in her butt?" When Allen replied that he had not, Detective Riley asked him "You sure of that?" and "Could you have?" Allen then stated "I might have. I could have."

c. After Allen initially stated that he left Ms. Bell's home immediately after having sex with her, Detective Riley asked "when you started to go was she still screamin' or what was she doin? Cause what's gonna keep her from

screamin' if you left?" After Allen responded that he had hit Ms. Bell with his hand, Detective Riley asked "Well,—didn't use nothin' else? Think about it now." After continued denials that he used anything but his hand to hurt the victim, Detective Riley directly asked Allen whether he stabbed the victim: "Didn't you cut her?" Allen stated that he didn't remember cutting the victim. Detective Riley further asked, "Didn't you get somethin' from the house and cut her?" Allen responded: "What, like a knife from the kitchen? It might have happened that I hit her or something—." Allen then stated that he remembered having a very small knife called a "lady finger." In response, Detective Riley state, "No, I'm talkin' about somethin' that might be bigger than that." Allen continued to deny cutting the victim, and only began to admit to doing so after at least 40 questions asking him to admit the stabbing and after Detective Riley implied in his questioning that the police had his fingerprints on the knife, telling Allen "We have the knife, you know. Do you remember if you touched the knife?" Allen ultimately admitted that he stabbed Ms. Bell.

d. Detective Riley directly asked Allen about the towel in which the knife had been wrapped: "Q. Did you pick up a towel while you was in the house? A. Yeah, I guess I did. Q. What color was it, do you remember? A. Um, I don't know. Q. Okay. Did you wrap anything in the towel? A. No."

Allen also made several statements in the confession that are inconsistent with known facts about the crime. For example:

a. Allen stated that the crime occurred at night, around dusk. The crime occurred in the morning.

b. Allen stated that he hit the victim with his hand. No blunt force injuries were found on the victim.

c. Allen stated that the victim was around 20 or 25 years old, 5 feet 6 inches tall, and had dark hair, whereas Ms. Bell was 31 years old, 5 feet tall, and had blonde hair.

d. Allen stated if he stabbed the victim anywhere "it had to be on her chest." Ms. Bell was stabbed in the back and neck and there were no stab wounds to her chest.

e. Allen stated that the knife was left on the floor, whereas the murder weapon was found wrapped in a towel in a cooler inside of a closet near the front door.

f. Allen stated that the victim obtained the knife from a drawer in the kitchen and that there were no other knives present, yet the presumed murder weapon came from a butcher block on Ms. Bell's kitchen counter that contained multiple knives.

g. Allen stated that the victim wore a white nightgown. A white nightgown was found on the bed and is visible in crime scene photos, but Ms. Bell had told Richardson when they spoke shortly before the crime that she had just finished showering and was putting on a robe.

Allen's confession included two details that police stated they did not know about prior to the interrogation:

**(i) Pam Richardson calling the victim's name**

During the recorded confession, Allen said that while he was inside Ms. Bell's apartment, he heard someone calling "Sherry" or a similar name while someone was banging on a door. Richardson testified that she knocked on Ms. Bell's front door between 10:30 and 10:45 a.m. Richardson heard "muffled bumping sounds" inside and what she described as the sound of a down jacket rustling against the door. Richardson testified that she banged on the door, and called out Mary's name two or three times. After about three or four minutes, Richardson left.

At trial, Detective Riley testified that although he knew at the time of the interrogation that Richardson had banged on the door for several minutes, Richardson had not previously told him that she had also called out the victim's name. Detective Riley testified that he phoned Richardson after the interrogation and asked whether she had yelled anything while knocking on the victim's door, and she replied that she had. Richardson testified that at some time well after the funeral (she could not recall precisely when), she received a call from Detective Riley: "He specifically asked me if I said anything at the door and I thought for a few minutes. I said 'Yeah, I called out Mary's name a couple of times.'" She also testified that she had previously forgotten calling out Mary's name and had not told anyone she had called out the name until Detective Riley called her and affirmatively asked her about it.

A March 18, 1982 police report authored by Detective Riley states that on March 15, Detective Riley phoned Richardson and she "was asked if at the time that she had knocked on the victim's door, did she yell anything out to the victim. She replied that to the best of her knowledge, she may have yelled, 'Mary, are you there, it's Pam,' or words to that effect."

**(ii) Sandra Salih opening and closing her door**

Allen stated in his confession that he thought the person who called out the name "Sherry" and banged on the victim's door was a neighbor because he heard a door open and close. Next-door neighbor

Sandra Salih testified that, sometime after 10:00 a.m., she heard screaming and crying coming from Ms. Bell's apartment. After the noises stopped, Salih heard a few knocks on the door. Salih did not answer right away because she assumed it was people wishing to shovel her snow, who had knocked on her door every day that week. Salih testified she was unable to distinguish knocks at her neighbor's door from knocks at her own door while up-stairs in her apartment. She testified that she eventually opened her own door and saw a woman (presumably Richardson) leaving Ms. Bell's porch. Salih testified that she then closed her door, went up-stairs to get her shoes, and then went out her front door again to get her mail.

Detective Riley testified that, at the time of the interrogation, he was unaware that Salih had opened and shut her door. Salih initially told police that she didn't hear anything or know anything about the crime. Shortly after the crime, police sent Salih twice to see a hypnotist, though she stated at trial that she did not go under and did not tell him anything. At trial, Prosecutor Hoag elicited Salih's testimony regarding her hypnosis session.

Salih first admitted to police and prose-cutors that she saw Richardson outside of Ms. Bell's door and heard screaming com-ing from Ms. Bell's apartment in April of 1983, over a year after the crime occurred. At that time, she told police her account of when she opened and closed her door. Salih testified that she waited to tell any-one what she saw because she was scared and her family told her not to get involved.

Near the end of the confession record-ing, Allen stated that prior to the interro-gation he had no knowledge of the details to which he confessed. In response to a question by Detective Riley as to why Allen did not recall details, the following exchange occurred:

Allen: I'm rememberin' it 'cause you got the evidence. I don't—

Riley: I showed you—

Allen: remember nothin'.

Riley: You mentioned the knife. You mentioned the knife. You said a knife in the kitchen.

Allen: Yeah, but you got the evidence and the fingerprints, you know. Before we started talkin' I said, no, I don't remember.

Riley: But now you do. Do you remem-ber now?

Allen: Yeah, I remember.

Allen lived in University City at the time of the crime and his arrest. University City is approximately 10 miles from La-Salle Park, where Ms. Bell lived. The confession did not include any explanation of how Allen was able to travel from Uni-versity City to LaSalle Park on the day of the crime notwithstanding the deep snow on the ground.

Joseph Crow, a criminologist for the St. Louis Metropolitan Police Department, testified at trial about serological testing conducted on evidence collected from the crime scene and the autopsy. Crow testi-fied that Ms. Bell was ABO blood type A. ABO blood type is determined by the anti-gens found in the person's blood. There are three types of blood antigens—A, B, and H. The H antigen is present in all people's blood. Type O blood contains only H antigens, type A blood contains A and H antigens, type B blood contains B and H antigens, and type AB blood con-tains A, B, and H antigens. Crow also determined that Ms. Bell was a secretor. If a person is a secretor, they secrete their antigens into other bodily fluids other than their blood.

Crow testified that seminal fluid was present on the anal and vaginal swabs of the victim, the victim's brown robe, the

crotch of the jeans, a piece of carpeting from under and near the victim's body, a director's chair from the kitchen, and tissues in the pocket of the robe. Crow reported that the anal and vaginal swabs, brown robe, chair and pants all revealed the presence of A and H antigens. Crow testified that "We know that the person who deposited the seminal stain is not a B person, nor is he an AB person. He could be a non-secretor. He could be a type A secretor, or he could be a Type O secretor." Crow also testified that he determined Allen to be a non-secretor by testing his saliva. Crow testified that Allen therefore could not be excluded as the source of the semen recovered from the victim and at the scene. Crow also testified that roughly 89–90% of the population could be the source of the semen found at the crime scene. In its closing argument, the State argued to the jury that had Allen been excluded as the source of the semen, "We wouldn't be here. We'd know that he couldn't have. But it's consistent."

The prosecution pointed to the Medical Examiner's testimony regarding lacerations around the victim's rectum and argued that it corroborated the defendant's confession: "on top of that you've got the tears from Dr. Laposata, rectal tears, consistent with what the defendant told you [in his confession]." The prosecution also argued that the locations where semen was found were "consistent with what the defendant said," and therefore corroborated his confession.

> And the defendant also tells you that he had sexual intercourse with her on the floor right here between the bed and the wall.... And that's where that carpet was taken up.... It was analyzed by Crow, and what was found there? Seminal acid phosphatase, male seminal fluid. It's consistent with what the defendant said. Sex on the floor. He says

that they had anal intercourse, rectally. Seminal acid phosphatase is there.... You've got the defendant indicating that he remembers chasing the woman through the kitchen.... They had two fights, one before and one after. There's blood in that stool, blood in the captain's chair and seminal acid phosphatase.

Crow's testimony regarding the presence of semen on the evidence was based solely on a positive finding of seminal acid phosphatase, an enzyme that exists in high levels in semen, which he testified was sufficient by itself to conclude that semen is present. Crow did not conduct a visual microscopic sperm search on the carpet cutting or the director's chair, and he did not see any sperm in his microscopic visual examination of the vaginal and anal swabs.

Gerald Hart, a latent fingerprint examiner, testified that he received physical evidence and paper evidence from the crime scene, including 27 latent fingerprints. Hart testified that he was able to identify 20 of the 27 fingerprints. According to Hart, nineteen of them belonged to Watters (Ms. Bell's live-in boyfriend) and one belonged to a police officer at the crime scene. Hart testified that the remaining seven prints "were of no value, not enough ridges to identify."

Fiber samples also were collected from the crime scene and compared to fiber samples taken from Allen's home. None of the five different types of fiber and garments police collected from Mr. Allen's home matched any of the fiber samples taken from Ms. Bell's home.

The defense argued that Allen was innocent and had falsely confessed to the crime as a result of Detective Riley's pressure and leading questions. Allen's trial counsel also presented the testimony of family members that Allen was home at the time of Ms. Bell's murder. Lonzetta Taylor,

Allen's mother, testified that on the morning of February 4, 1982 (the day of Ms. Bell's murder), her daughter Elfrieda's car got stuck in the snow when she was backing out of the driveway. At eight that morning, Taylor went inside and woke Allen up so that he could help push the car out of the snow. Taylor further stated that, with the exception of going to a store for less than an hour around noon, she was home all day—including the specific timeframe during which Ms. Bell was murdered—and Allen never left the house. Taylor had likewise told police when they searched her home on March 17, 1982 that she had read in the papers that the victim was murdered on the morning of February 4 and Allen was home with her that morning.

Elfrieda Allen, Allen's sister, also testified that on the morning of February 4, Allen helped her push her car out of the driveway. Elfrieda's boyfriend, Joseph Randolph, testified that he was at the Allen household on February 4, until about four in the afternoon and had been there snowed in for several days. When Randolph got up around 10:00 a.m. on the morning of February 4, Allen was home, and Allen did not leave the house while he was there. Randolph stated that he remembered this day because February 4 is his sister's birthday, and he called her from the Allen residence. On cross examination, there was some confusion among the defense witnesses about when Randolph got snowed in, and how many days he stayed at the Allen's house. Randolph testified that he thought he stayed three days and two nights, but that it was possible he had stayed longer. Taylor also testified that she couldn't remember precisely how many days Randolph was at the house, but that he stayed "most of the week."

Allen's first trial was held on April 20–22, 1983, before Judge Koehr and ended in a hung jury. The jury deliberated for nine hours and was deadlocked 10 to 2 in favor of acquittal. The second trial occurred from July 18–25, 1983, before Judge Mehan. At the second trial, Allen was convicted of capital murder, rape, sodomy, and first degree burglary. After one of the jurors had to be excused prior to the sentencing hearing, the State waived the death penalty and Allen was sentenced to a total of 95 years. Dean Hoag served as the primary prosecuting attorney for the Circuit Attorney's Office at both trials. Doug Levine was Allen's primary defense attorney during the trials.

During an offer of proof in Allen's first trial, outside of the presence of the jury, Allen's counsel presented to the court the testimony of Torrence Stone. Stone testified that while confined in the St. Louis City jail from February until June of 1982, he was unexpectedly taken from his cell to meet with Detective Riley. Detective Riley informed him that he had made arrangements for Allen to be transferred to the floor in the jail on which Stone was being detained and asked Stone to speak with Allen to see if Allen would provide him with any information about the case. Stone testified that Allen never made any inculpatory statements.

Stone further testified that although he informed Detective Riley that Allen had not made any inculpatory statements, Detective Riley directed Stone to write two statements claiming that Allen had told Stone that he had committed the murders and Detective Riley dictated significant portions of those statements to Stone. Allen's counsel endorsed Stone as a witness at the first trial in order to show "interest, bias, [and] prejudice on the part of Herb Riley to the extent that . . . he would twist someone's arm to the point to make them

write a letter that was not true or write two letters that were not true." In response, the State told the court that while Detective Riley disputed the allegation that he himself had dictated portions of the written statements, there was "no conflict" between Stone's account and Detective Riley's account "in respect to Herb Riley asking Torrence Stone to obtain whatever information he could [from Allen]."

Judge Koehr barred the defense from presenting the Stone testimony before the jury, holding that Detective Riley had a "duty" to "pursue any further investigation even though he had a confession in his hand and to use any legitimate means at hand to further that investigation," and that Stone's testimony would result in "out and out speculation on the part of the jury." Judge Koehr stated further that even if the State would agree "unequivocally on the record that Herb Riley did, in fact, dictate [Stone's] statement … again this Court would still rule that it was immaterial and inadmissible in the trial of this case."

At the second trial, defense counsel presented Judge Mehan with a transcript of Stone's proffered testimony from the first trial and asked the judge to allow him to present Stone as a witness. Judge Mehan's ruling on Stone's testimony is not part of the record, but he ultimately did not testify at the second trial.

### Allen's Direct Appeal

Allen's conviction was affirmed on appeal. *Allen,* 684 S.W.2d 417. Among other issues, Allen argued on appeal that the trial court erroneously failed to exclude his confession, both as a result of a warrantless arrest and because it was involuntary. *Id.* at 419. Noting that its standard of review required it to affirm the trial court's decision to admit the confession absent "manifest error," the Eastern District concluded that Allen had been duly Mirandized and had acknowledged on tape that his statements had been made "of his own free will." *Id.* at 422. The court noted that Allen "had been in custody less than three hours prior to his giving a taped confession." [10] *Id.* The court concluded:

> At no time during [Allen's] statement did he express anything indicative of coercion and the record fails to substantiate any coercion, physical or otherwise. We find no error in the admission of defendant's confession.

*Id.*

Allen also challenged the sufficiency of the evidence to permit submitting the case to the jury, arguing that he could not "be convicted solely upon his confession, where the confession appears inconsistent and no other physical evidence linking him to the crime exists." *Id.* at 423–24. The court agreed with Allen's recitation of the law, but concluded that "[t]he laceration of Mary's anus and the seminal fluids indicative of intercourse found in her vagina and anus were consistent with defendant's confession that he had sex with her and that he had sodomized her." *Id.* at 424. In addition, the court noted that as to the inconsistencies in Allen's confession, "several points in [Allen's] confession, subsequently corroborated by evidence introduced by the state, were not known to the interrogating detective at the time [Allen] gave his confession." *Id.* In particular, the court pointed to the testimony of Richardson and Salih. *Id.* Ultimately, the court

---

10. The court accepted as true Allen's assertion that he had been interrogated for this extended period before the recording commenced, and not Detective Riley's contrary assertion that Allen had only been interrogated for a few minutes before the recording commenced.

concluded that "the jury was at liberty to find that the confession was not voluntary and reject the same, but they did not." *Id.*

### The Undisclosed Evidence Discovered After Allen's Conviction [11]

#### (i) Scaggs Report and Laboratory Worksheet

In 2010, while inspecting the Allen case files at the St. Louis Circuit Attorney's Office, Allen's habeas counsel discovered a blue folder with several documents that they had never previously seen. Among these documents was an internal memorandum from the St. Louis Police Department dated February 26, 1982. The Internal Memorandum recites that it was drafted by Detective Ron Scaggs and addressed to "Lieutenant Wm. J. Wilson, Acting Commander, Homicide," with copies sent to three additional police officers, including Detective Riley, and one copy designated to "file."

The undisclosed Internal Memorandum states: "Note that the suspect in the case probably has B or A–B blood." The Memorandum also reflects that investigators were collecting blood typing samples from numerous people connected with the case, including two early suspects, Eaton and Eddie Simpson, a local handyman. Investigators were also collecting samples from Watters, Ms. Bell's then live-in boyfriend, and John Bell, Ms. Bell's estranged husband. There is no indication in the record that Ms. Bell had any other consensual sex partners in the period leading up to her murder. The Internal Memorandum sets forth John Bell's blood type as Type A and states that police had not yet succeeded in obtaining a sample from Watters.

The Memorandum was not disclosed to either the Circuit Attorney's Office or the defense at the time of trial. It is unclear how and when the Internal Memorandum later came into the possession of the Circuit Attorney's Office.

Another document in the same blue folder—an undated second page of a Continuation Report which did not have a first page accompanying it—reports that police collected a reference sample from Watters on March 8, 1982, and that his blood type was Type O.

The microfiche file of the St. Louis Police Crime Laboratory contained a handwritten Laboratory Worksheet pertaining to analysis of evidence from the Bell homicide. The worksheet does not show a date on which it was completed, but provides February 9, 1982 as the "Date Examined." Portions of the handwritten Laboratory Worksheet contain crossed-out sections of text. There is no indication on the worksheet when these cross-outs were made.

One cross-out appears in the second paragraph of the "summary" section on the Laboratory Worksheet's last page:

---

11. With minor and immaterial exception, our recitation of the undisclosed evidence is quoted directly from the Judgment, which borrows heavily (and generally verbatim) from the Stipulated Facts. For the sake of readability, we have deleted the record references included by the parties in the Stipulated Facts and by the habeas court in the Judgment.

Though the second paragraph of the summary is concealed with scribbled lines, it is possible to read the words beneath.

When the horizontal and scribble lines are removed, the text of the second paragraph is revealed as follows:

The text reads: "[The] seminal stains came from two different persons one came from a type 'B' or 'AB' person[.] The other from an 'A', 'O' or non secretor[.]"

Additional text from the Laboratory Worksheet is stricken through on the third page of the document, which reports the ABO antigens that were discovered from testing on the victim's robe. The Laboratory Worksheet reflects that both blood and semen were found on the robe, and shows a cross-out in the finding of antigens in testing of the stains:

The relevant text reads: "The following were also present: the 'A', [obscured], and 'H' 'ABO' antigens." The only antigens in the ABO antigen system are A, B, and H antigens, and thus the obscured text in the sentence is a reference to the B antigen.

The Laboratory Worksheet was not produced to the Circuit Attorney's Office or to Allen's counsel at the time of trial. Neither Dean Hoag nor Doug Levine, Allen's counsel, were aware that there had ever been a finding of B antigens made by the lab or that police had been informed of this B antigens finding and were using the finding as an investigative lead.

The deleted text is absent from the final, typed Laboratory Report. The summary of results solely mentions testing on blood and makes no mention of any of the seminal fluid findings reflected in the report. With respect to the report of antigen findings on the robe, the final Laboratory Re-

port states solely that A and H antigens were found. Like the Laboratory Worksheet, the Laboratory Report does not show a date on which it was completed and provides February 9, 1982 as the "Date Examined."

Ms. Bell, Watters, John Bell, and Allen are all excluded as the source of B antigens. Allen is a Type O non-secretor. Watters, John Bell and Allen all could not be excluded on the basis of serology testing as the source of semen "from an 'A', 'O' or non secretor."

Crow has provided accounts on at least four separate occasions regarding the cross-outs.

*Account # 1*

In preparation for a meeting with habeas counsel in July 2011, Ed Postawko, Chief Warrant Officer of the St. Louis Circuit Attorney's Office spoke with Joe Crow. Crow stated that he had no recollection of making the cross-outs in the Laboratory Worksheet or any specific recollection of the testing from the Bell case. Crow consistently affirmed in his subsequent statements that he has no specific recollection of the testing or the cross-outs.

*Account # 2*

On November 7, 2011, representatives from the Attorney General's Office—Investigator Greg Martin and Assistant Attorney General Sue Boresi—interviewed Crow at the lab. The conversation was memorialized in a memo from Martin dated November 8, 2011, and Crow later confirmed at a sworn deposition taken on January 17, 2012 that the memo was an accurate account of his statements at his November 7, 2011 interview.

In his interview with the Attorney General's office, Crow reviewed the Laboratory Worksheet and "identified the

'scribbles' on the page as being his. He said it was his usual practice to change his notes this way prior to them being typed. He could not say when this happened." Crow told Martin that the typed Laboratory Report "was the final, and correct, report made from his corrected notes. He said the date on the report was most likely the date he began doing his examinations referred to in the report. He then handed his notes to someone to type. He could not say how long it took for his notes to be typed, possibly weeks."

Crow also told Martin that "typing could be so close as to be subjective. He believes he erred on the side of caution by stating there was no B type blood found in the samples. He said the reason for the parts being scratched out in his [Worksheet] is because, after additional reflection on his test results, he changed his interpretation of the results due to a weak reaction. This could be due to several factors, including a false positive for B type blood, or an actual B blood sample too small to react properly to the test."

In his interview with Crow, Martin mistakenly reported to him that Allen is a Type B non-secretor (instead of a Type O non-secretor). In response, Crow informed Martin that "it is possible that the B result he initially interpreted could have come from a B non-secretor since the sample tested and referred to had blood and semen in it. Even though a non-secretor would not secrete his blood type in semen, the blood type would still be apparent in his blood. If the attacker contributed type B blood to the sample Crow tested, this could account for Crow's initial interpretation. The sample of B type blood could have been too small for a strong enough reaction during testing. This would not be

exculpatory for Allen." (*Id.*). At his later deposition, Crow affirmed that he made this entire statement but denied that he told Martin that this "would not be exculpatory for Allen."

*Account # 3*

On January 17, 2012, in his sworn deposition testimony, Crow testified that he reviewed the entirety of the existing lab file for this case and confirmed that he had no independent recollection of the serology testing from the Bell homicide. Although he acknowledged that the crossed out antigen finding on the robe had to have been a B and identified the cross-outs on the worksheet as his based on his general practice of changing his notes prior to a final lab report being typed, he does not recall finding B antigens on the robe, deleting the finding from his Laboratory Worksheet, or when or why the cross-outs were made. He also has no recollection of speaking with Detective Scaggs about this case.

Based on his general practices and his review of the documents, however, Crow testified at the deposition that as he conducted serology testing on the various items of evidence submitted from the Bell homicide, he would have taken detailed notes on a yellow note pad. Though the yellow note pad still likely existed at the time of trial, it no longer exists today.

Sometime after the testing, Crow then would have written out the Laboratory Worksheet by hand, and he included both the B antigen finding in the robe results as well as his conclusion that the seminal stains came from two different people, one of whom was a Type B or AB person. Crow went on to state that he would have reviewed the Worksheet prior to its being typed, and at that point must have made the deletion.

When asked what he meant when he told Martin that he "erred on the side of caution," Crow admitted in his deposition that had he reported that there was B antigen in the semen, someone who was a non-secretor—like Allen—could argue that the presence of B in the sample exculpated them of the crime. Crow acknowledged that the February 26 Scaggs report noting "that the suspect in the case probably has B or AB blood" is consistent with the police having asked the lab for a verbal update on the testing and the lab having verbally reported the B antigen finding in semen on the robe. Crow stated that such verbal reports were a common occurrence.

Detective Scaggs likewise testified at a sworn deposition that such verbal reports were common. He stated that he does not have any recollection of drafting the memo or speaking with the lab about testing in the case, but knows that he would not have written the serological information in the report unless he had obtained it from the serologist in the lab.

The records are unclear as to precisely when Crow learned Allen is a non-secretor. On March 15, 1982, the day after Allen's arrest, Crow came to the jail and collected a saliva sample from Allen. The lab files do not currently contain any laboratory report, receipt or worksheet reflecting testing of the sample collected on March 15, 1982, or any comparison of those results to the crime evidence. But Crow admitted in his deposition that his usual practice would have been to type the sample right away.

Crow has no recollection of when a final report was completed on this case (he only knows he began documenting test results on February 9, 1982 and that

results from testing on 21 different "specimens" were included in the lab report at issue, many of which contained numerous individual items). According to Crow, lab reports were generally typed within two to three weeks of the testing being completed. However, Crow stated that some cases took longer and there were often backlogs.

Crow admitted that "[he] can't rule out looking at his data that [he] erred on the side of caution by crossing out the finding of B antigens in the semen because [he] believed it came from a weak reaction after learning that Allen was a non-secretor." Crow testified that he nevertheless believes he deleted the B antigen finding from his Laboratory Worksheet prior to knowing that Allen was a non-secretor, and upon questioning by the Attorney General estimated an 80 or 90 percent likelihood that he had completed his final report prior to Allen's arrest on March 14. Crow admitted that he has no data upon which this estimation was based, and does not know whether there were any backlogs or other external factors that would have caused a delay in finalizing the lab report in the Bell case.

Allen was not indicted until April 28, 1982. In September of 1982, the State filed a motion to collect a saliva and blood sample from Allen, which was granted on October 6, 1982. The lab received a saliva sample on October 14, 1982, and a laboratory worksheet—written by Crow—from testing on October 21, 1982 states that Allen is a non-secretor and that "[t]he results are consistent with the victim and suspect having had intercourse." Crow stated that he would be surprised if he did not obtain and type a sample from Allen until October, several months after his arrest. The lab files do not currently contain any receipt for the October sample or a

final, typed laboratory report reflecting the results from testing on the sample. Crow testified at the deposition that when he stated that the B finding may have been due to a weak reaction, he was referring to a weak reaction on the agglutination scale. In the Absorption Inhibition procedure used by Crow, biological material is extracted from a stain and the extract is placed into 3 different tubes or wells. A antiserum is placed in one tube, B antiserum in a second tube, and H(O) antiserum in the third tube. The antisera will bind to the antigens present in the stain (*e.g.* anti A will attach itself to any A antigens present, etc.). ABO indicator cells are then added to each tube or well (*i.e.* A cells to the anti A tube, B cells to the anti B tube and O cells to the anti H tube). If the antigen was present in the sample, then the antiserum would already have been used up. The indicator cells would therefore lack anything to bind to and the cells would not clump, or agglutinate. If there was no antigen present in the sample, the antiserum would have remained active and the indicator cells would agglutinate together. The final step of the process is to observe and score the degree of agglutination under a microscope. The scoring of the agglutination scale has a range of 0 to 4 with 0 indicating no agglutination (a full lack of reaction, showing the antigen is present) and 4 indicating complete agglutination (a full reaction, showing the antigen is not present). In between these levels, $+1$ indicates some agglutination, $+2$ indicates moderate agglutination, and $+3$ indicates a lot of agglutination but not complete.

Since Crow no longer has the yellow pad on which he documented the exact agglutination results, he testified that he does not know precisely what level of reaction he obtained: he knows only

that it was not a 0 or +4. Crow testified that he considered any reaction that was a +1, +2 or +3 to be a weak reaction, and so the B reaction he got on the robe could have been any of these. Crow confirmed that he believed the testing to be subjective, as drawing a conclusion based upon a +1, +2, or +3 result required a judgment call as to whether the weak result was due to the presence of the antigen, or whether instead it was the result of a false positive.

When asked in the deposition what he meant by a "false positive," Crow explained that a "false positive" could be the result of a problem in the amount of antiserum or its dilution. But Crow admitted that this did not make sense as an explanation for the B antigen finding in this case: he admitted that his practice was to run controls with every test, and that if there had been a problem with the testing such as a failure to use the proper amount of antiserum, the controls would have picked up the problem. Had the controls shown a problem, Crow testified that he would have redone the test and would never have written the B finding into his Worksheet unless his testing ultimately obtained a result with a properly reacting control.

Crow also confirmed his previous statement to Martin that the presence of a weak B antigen could have been the result of a small amount of B blood from the perpetrator comingled in the semen stain. Crow would have taken a cutting from the robe that visually appeared to be solely semen and not blood, but a small amount of B blood may nevertheless have been mixed in and could have accounted for the B antigen result.

*Account # 4*

Subsequent to his sworn deposition, Crow provided Attorney General Mi-

chael Spillane with a letter including the following:

a. "I believe in this case that the dilutions were a little off. The controls were correct but a sight [sic] decrease in the amount of B antibodies occurred in the questioned sample. I believe this was caused not by a bad dilution of antiserum but by a smaller then expected volume of B antiserum placed in the test tube. This would appear to indicate the presence of a small amount of B blood. I tried to add a reproducible amount of liquid every time. I believe that this did not happen this time."

b. "Although originally I thought this caused by B blood; after thinking about it more I did not feel that the decrease in activity was sufficient to say B blood was present."

**(a) Brian Wraxall affidavit**

Allen's habeas counsel retained nationally renowned serological expert Brian Wraxall, who was the author of training materials utilized by the St. Louis Police Department Laboratory. Wraxall issued an affidavit which included the following findings:

a. "It is not uncommon to see weak A/I results in forensic stains. If the antigen is at low levels, eg. sweat, +1 or +2 agglutination reactions are very possible. Mixtures of vaginal secretion and low levels of semen would be expected to give a low level of agglutination for the semen donor if his ABO type is different from the vaginal secretion donor. There are no known false positives with Absorption Inhibition. . . ."

b. "Mr. Crow is incorrect in his understanding of what the levels of agglutination indicate. A +1 or +2 result means that B antigen is present in the sample and in no way calls for a subjective decision as to whether or not to report the result. As noted above, many things

could have led to a weak B result here, including a smaller than usual amount of type B semen in the sample or ... a small amount of type B blood in the sample. George Allen, who is an ABO type O non-secretor, is excluded as donating that 'B' activity, irrespective of whether the B activity was from semen or blood. It is not at all uncommon to obtain a weak result in A/I testing. The proper procedure is to report the result, and indicate in the report that the result is weak."

c. "Mr. Crow admitted at his sworn depositions that if there had been a control failure, he would have re-performed the test and would not have made the B antigen finding at all or reported it as inconclusive. He offered that testimony as being the general practice and procedure at the time and has maintained that he has no independent recollection of the testing in this case. If the antisera was improperly diluted, the controls would have indicated that the problem was occurring. Now Mr. Crow has sent a troubling letter to Attorney Spillane containing speculation that he may have used less B antiserum in just the B tube for the Robe stain, which the control would not pick up. This does not make sense as a scientific matter and has absolutely no factual basis. The St. Louis crime lab procedure requires 3 drops of antiserum per tube and 1 drop of cells. The normal ratio of cells to antiserum is 1:1 not 1:3. So reducing the amount of antiserum in 1 tube even by 1 drop would not make a significant difference to the agglutination, possibly a reduction from +4 to a +3 but not to +1 or +2. And even if a reduction in the amount of antiserum could somehow lead to a significant difference in agglutination, there would be absolutely no way to determine whether this was the source of the problem without redoing the test. Not only is it scientifically implausible that the B finding resulted from Mr. Crow using a smaller amount of antiserum in the B tube for the Robe stain, but additionally Mr. Crow provides absolutely no basis for how he knows that this was the source of the B finding instead of there being a small amount of B in the sample."

d. "Mr. Crow's decision to cross out the B finding is unscientific and unsupported by any notes. His explanation that he believes he 'erred on the side of caution' itself reveals a bias that is inappropriate in a forensic scientist. The deletion of the finding from the report is only 'cautious' from the point of view of supporting a particular theory of the crime. A scientist's obligation is to report their results accurately, whether or not the results fit a particular understanding of the crime. The proper, cautious approach would have been to report the finding, and note in the report that the result was weak. If, additionally, Mr. Crow actually knew that Mr. Allen was a non-secretor before he decided to cross out his finding and this knowledge played any role in his decision that the B antigen was a 'false positive', his doing so was wrong and unethical."

e. "All of these issues could have been answered at the time of trial when the original scoring sheets and notes would have been available for review. The defense attorney could have retained an expert who could have reviewed the data, reanalyzed the evidence, consulted with the defense attorney and testified at trial. There was evidence of the B antigen on the robe—even if it was a weak B antigen—that excluded George Allen as the donor of that stain and a defense expert could have reviewed Mr. Crow's notes and testified as such. The

expert's testimony could have put the crime laboratory analysis in proper perspective."

### (b) Doug Levine Affidavit

Allen's defense counsel at trial, Doug Levine, provided a sworn affidavit stating that:

a. "Had I been aware that foreign B antigens were detected in seminal fluid at the crime scene, I would have presented this information to the jury to show that Mr. Allen—who could not have been the source of those antigens—was not the perpetrator."

b. "Had I known this information, I would have argued that the credibility of the police is seriously impeached by the fact that the B antigens finding—which was inconsistent with police's theory that Mr. Allen was the perpetrator—ultimately does not appear in either the Final Lab Report or Joe Crow's testimony."

c. "[W]ith the Skaggs [sic] report and the cross out on the handwritten lab notes, I would have been able to raise substantial questions about the lengths these detectives would go to cover up facts that were inconsistent with their theory of the case."

d. "[A]t minimum, had I known about the Lab Worksheet, the Scaggs Report, or the information contained therein, I would have called an expert to review the serological data and critically examine any rationale that might be given for police or laboratory officials and police deciding that the perpetrator was not a B or AB secretor, or for how a laboratory finding of a B antigen in seminal fluid at the crime scene could be left out of the final type written report ultimately presented to the prosecutor, defense counsel, and the court without any explanation or documentation."

### (ii) Pamela Richardson's Hypnosis Session

In a sworn affidavit dated June 28, 2011, Pamela Richardson stated:

a. "As I try to recall to the best of my ability today, I am not sure if I called Mary's name at her doorstep on the morning of February 4, 1982. When Detective Riley asked me if I had called out Mary's name, it seemed logical that I would have done so since she had not responded to my knocking."

b. When Richardson received a telephone call from Detective Riley asking if she had yelled anything while knocking on the victim's door, she told Detective Riley "I may have done so."

c. Sometime in the summer of 1982, Detective Riley arranged for Richardson to be questioned by a hypnotist. Richardson stated in her affidavit that "I underwent a session of hypnosis. I didn't go deeply under but felt I was getting there. The hypnotist asked me about what had transpired while I was on Mary's stoop the morning of her death on February 4, 1982. He was particularly interested in whether I had called out and what I had said while at Mary's door. The hypnotist asked me to repeat what I had said at the door and I told him I had said, 'Mary, is that you?' "

Neither the defense nor the prosecution was aware that Richardson had undergone a hypnosis session. In a sworn affidavit, defense counsel stated that:

"The fact that Ms. Richardson had to be hypnotized before she testified to having a clear memory of calling out Mary's name would have helped me raise serious doubts about whether Pam Richardson had a clear memory of this important detail or was not really sure at all. Even more telling, the failure of police to document this hypnosis session or

disclose it to prosecutors, the defense, and the court could have been used, had I discovered this information at the time of trial, to undermine the jury's faith in the integrity of the police investigation."

### (iii) Fingerprints

In January 2012, the St. Louis Police Department produced previously withheld fingerprint records. The documents include copies of the original evidentiary envelopes that contain many of the latent prints collected in the investigation of the Bell homicide, with the fingerprint examiner's notes on the envelopes.

In April 2012, the St. Louis Police Department produced additional previously withheld fingerprint records. Those documents include copies of the original evidentiary envelopes, copies of the fingerprint lifts themselves, and numerous pages of additional fingerprint examiner's handwritten notes.

Collectively, these documents demonstrate that there were a total of seven unidentified prints that were useable for identification, namely, prints from: (i) the underside of the handrail from the stairs to the third floor; (ii) a ceramic flower pot on the window sill in the bedroom (north wall); (iii) the formica window sill in the kitchen (south wall); (iv) a decorative metal box on the bathroom vanity; (v) a document pertaining to the victim's Volkswagen; (vi) a Lafayette Federal Savings bank statement; and (vii) a vehicle inspection document from Mid–America Motors. The ceramic flower pot described above sat on a windowsill in the victim's bedroom, a few feet away from where the victim's body was found. The kitchen windowsill overlooked the apartment building's courtyard. The only entrance into Ms. Bell's apartment is through this courtyard, on the south side of the apartment building. The papers, where an additional unidentified print was found, were "scattered" in the kitchen.

The documents reflect that prints (i)-(iv) listed above were usable and were compared to the victim, Watters, and Allen, none of whom were the source. At least three of these prints were compared to a number of other people as well, including suspects who were compared to the prints after Allen's arrest. Prints (v)-(vii) were also usable and were not identified, though the documents do not specify to whom comparisons were made.

The print from the underside of the handrail on the stairway has since been identified through a match in the St. Louis Police Department's fingerprint database to a carpenter who had worked on rehabbing the victim's apartment complex.

The remaining six useable prints have not been identified.

### (iv) Allen's Drawing

At the suppression hearing at the second trial, Allen testified that the police asked him to draw a diagram of the crime scene, but police then told him that the diagram he drew was inaccurate. Allen testified that he was asked to make the drawing before the taped confession. The defense had previously filed a discovery motion for the state to "produce any diagrams drawn by defendant at request of investigating authorities of the premises of the victim," and that motion was granted on October 6, 1982. The diagram was never produced.

Detective Scaggs, a former homicide detective who was involved in interrogating Allen and was one of the original investigating detectives on the Bell homicide, testified at the deposition that he had asked Allen to draw a diagram of the crime scene, and Detective Scaggs believed Allen's resulting diagram to be inaccurate. Detective Scaggs agreed in his testimony,

"if the individual is claiming that he was in the room for a long period of time and he can't even draw that accurately, that raised questions in your mind as to whether or not he was giving a true confession as opposed to a false confession." He had asked Allen to draw this diagram immediately after Allen's taped statement. Detective Scaggs testified that he provided the diagram to Detective Riley moments later, and in the ordinary course of business it would be included in the police file. There is no indication that the diagram ever made it into the file, and to date the diagram has never been discovered.

### (v) Other Testimony from Detective Scaggs

Detective Scaggs additionally provided the following testimony at his sworn deposition:

a. When asked during his deposition whether he recalled questions being raised within the police department about whether or not the conviction of Allen was a good conviction and the possibility that Allen gave a false confession, Detective Scaggs recalled "I remember when it first happened, we were—we were iffy about it."

b. Detective Scaggs agreed that "homicide detectives [were] trained that in doing the interrogation of a suspect, that you wanted the suspect to give information to the police officers that only the police and the real perpetrator would know.... And you don't want to ask leading questions that might inadvertently feed information to the suspect.... And the reason that you want the suspect to be the one that gives information that only the police and the real perpetrator would know, is that gives you some confidence that the information you're getting from the suspect is reliable."

c. He agreed that the interrogation of Allen as reviewed in the deposition "was not the way that [he was] trained to do interrogations."

d. Detective Scaggs agreed that Detective Riley's use of "leading questions" "runs the risk that you would be inadvertently suggesting to a suspect how to answer a question."

e. Detective Scaggs also agreed that there is "a problem with providing to a suspect during the course of the interrogation actual photographs of the crime scene.... That runs the risk that by showing the photographs of the crime scene to the suspect, that you may be inadvertently feeding information that you, the investigator, would prefer to get from the suspect himself to make sure that you're getting reliable information that only the police and the perpetrator would know." The record evidences that Detective Riley at minimum showed Allen photos of the outside of Ms. Bell's apartment, her bedroom, the murder weapon, and of the victim herself. Detective Scaggs also agreed that there are "special risks" in showing photos to people with mental infirmities and then simply asking whether the suspect was at the place depicted, as Detective Riley did with Allen.

f. Detective Scaggs agreed that the factual errors in the confession "raise[ ] a red flag for an investigator that maybe this person I've got here may not be supplying me reliable information."

g. Given the totality of the course of the interrogation, Detective Scaggs testified that Detective Riley's questioning regarding whether Allen stabbed the victim was particularly problematic. Detective Scaggs agreed that it was "a very dangerous question" when Detective Riley directly asked Allen whether he cut the victim after Allen failed to

independently state he stabbed the victim upon multiple questions from Detective Riley. He agreed that it is "very dangerous because here you have somebody who's been giving incorrect answers about a number of important details. . . . And that has been shown pictures of the crime scene and been asked a number of leading questions about important details. . . . And the fact that this was a vicious stabbing, that's exactly the kind of detail that you want to make sure that you get from the suspect, and the officer does not suggest it."

h. In response to questions regarding Allen's admissions to sexual assaults in the interrogation led by Officer Larose prior to the Detective Riley interrogation, Detective Scaggs agreed that "if it turned out that he could not have committed those other sexual assaults that at one point that day he was confessing to, [that] is . . . the kind of information that would raise questions in the minds of investigators as to the reliability of any confession he was giving." Detective Scaggs agreed that if admissions to rapes in the Larose interrogation had been credible, it would have been regular policy to investigate Allen for those crimes after he confessed to the Bell killing.

The defense was unaware that Detective Scaggs would have provided testimony to this effect.

### (vi) Investigator Notebooks from Detective Burgoon

On June 5, 2012, the St. Louis Circuit Attorney's Office produced hundreds of pages of previously-undisclosed investigator notebooks from Joe Burgoon. Burgoon is a former St. Louis Police Department homicide detective on Detective

Riley's squad who also investigated the murder of Ms. Bell. The notebooks contain contemporaneous notes reflecting Burgoon's investigative activities in the period following Ms. Bell's murder.

One page of the notebooks reads: "offender might have AB blood—spot near body. Victim—A. Eaton: O Pos." The victim's robe was not found near the body, and there are no existing records showing whether the lab had in fact detected additional AB blood near the victim's body or whether Burgoon wrote down incorrectly the location where the B antigens were discovered.

### (vii) Lab Manual

It was widely accepted in the scientific community at the time of Crow's testimony at trial [12] that the acid phosphatase test is solely a presumptive test that can produce false positives, and thus should be followed by a microscopic visual sperm search before declaring the presence of semen. The lab manual in use at the St. Louis Police Crime Laboratory at the time states that an acid phosphatase reading is insufficient to determine the presence of semen:

> [I]t should be noted that the presence of these compounds [acid phosphatase] only indicates the presence of semen. Visual observation of spermatozoa is needed for a positive identification of semen. . . . While it is generally accepted that high concentrations of acid phosphatase are present in semen, it should be reiterated that a positive test for the enzyme is not conclusive evidence as to the identity of a stain as semen. . . . In spite of the several chemical tests available, the visual identification of spermatozoa is a time-honored means of positively identifying semen. . . . Acid phosphatase is a valuable indicator of the presence of semen. A

---

**12.** The parties stipulated that the same is true today.

positive test, however, while considered conclusive by some workers, does not constitute proof positive and should be confirmed.

Doug Levine, counsel for the defense, did not cross-examine Crow on his failure to confirm his positive acid phosphatase findings with a sperm search prior to concluding that semen was present. It is unknown whether Levine possessed the lab's manual.[13]

### The Habeas Court's Conclusion that the Undisclosed Evidence was Material

The habeas court found that Allen is entitled to habeas corpus relief "because the police failed to disclose favorable, material evidence at the time of trial in violation of his right to due process under *Brady v. Maryland* and *Kyles v. Whitley.*" [Judgment, p. 42]. The habeas court summarized the undisclosed evidence on which it relied to reach this conclusion as follows:

- Serological test results showing that foreign semen or other biological fluids—which could not have been deposited by Allen or, critically, by the victim's boyfriend or estranged husband—were found on the robe the victim was wearing at the time of the attack.

- Internal police documents showing that the police lab reported the exculpatory findings to the police investigating the case, and that police relied on the undisclosed serological results, pointing to a perpetrator with Type B or A/B blood, to exclude suspects until they obtained a confession from Allen.

- Documents showing that fingerprints found at the crime scene, which the State claimed were mere smudges unusable for comparison, were in fact usable and excluded Allen as the source, and were tested against numerous alternate suspects even after police obtained Allen's confession.

- A drawing of the crime scene made by Allen, which Detective Scaggs had asked Allen to draw to test his actual knowledge of the scene and to determine if his confession was credible. Detective Scaggs determined that the drawing was not consistent with the actual layout of the crime scene.

- Evidence that a key State witness, Richardson, whose testimony that she yelled out the victim's name was pivotal to corroborating Allen's confession, had to be hypnotized in order to provide the certain trial testimony she offered.

[Judgment, p. 45]. The habeas court concluded that "[c]onsidered separately or together, this information constitutes favorable, material evidence that the State withheld at trial in violation of its clearly delineated constitutional obligations under *Brady/Kyles.*"[14] *Id.*

---

13. The Stipulated Facts, and thus the Judgment, include discussion of the lab manual as a part of summarizing the evidence at trial. In fact, it is clear that the lab manual's recommended procedure, and the fact that the procedure was not followed by Crow, were *not* raised at trial. Thus, this information could only be relevant to Allen's *Brady* claim if it can be demonstrated that the lab manual was improperly undisclosed. We have thus placed the stipulated discussion of the lab manual into the portion of our Opinion addressing "undisclosed evidence." *See,* however, footnote number 14.

14. Notably, the cumulative undisclosed evidence considered by the habeas court to reach this conclusion did *not* include the lab manual which called into question Crow's conclusion about the presence of semen based solely on the presence of acid phosphatase. We are not persuaded that the lab manual can be fairly characterized as improperly undisclosed. Although the parties stipulated that it is unclear whether Allen's counsel had the lab manual at the time of trial, they did not stipulate that the manual was requested by Allen or improperly withheld from Allen.

Before reaching this conclusion, the habeas court engaged in a lengthy discussion of the first prong of a *Brady* violation—whether the undisclosed evidence on which it relied was favorable to Allen as either exculpatory or impeaching—and concluded that this prong had been established. *Engel*, 304 S.W.3d at 126. In its writ petition, the Attorney General does not contest that the undisclosed evidence satisfied the first prong of the *Brady* analysis.[15]

The habeas court then discussed the second prong of a *Brady* violation—whether the undisclosed evidence on which it relied was improperly withheld by the police—and similarly determined that this prong had been established. *Id.* The habeas court made it clear that responsibility for the impropriety fell squarely and solely on the shoulders of the police, and that the prosecutor was not complicit in withholding evidence from Allen. The Attorney General does not contest that the evidence summarized by the habeas court was improperly undisclosed by the police, and does not contest that the prosecutor was bound by the failings of the police, notwithstanding the prosecutor's complete

lack of complicity. In fact, we observe that:

> [I]t is no hindrance to [Allen's] *Brady* claim that the prosecutor did not have the same knowledge about his case as the investigators. The prosecutor's lack of knowledge about information asserted in a *Brady* claim is not an impediment because the prosecutor is considered " 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' "

*Id.* at 127–28 (footnote omitted) (quoting *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

The habeas court then reached the third prong of a *Brady* violation, and concluded that the undisclosed evidence it had summarized was material, and thus prejudicial, to Allen because the fact that the jury was not permitted to hear the evidence undermines confidence in the trial court's verdict and calls into question the fairness of Al-

---

In addition, the habeas court did not rely on the additional testimony by Detective Scaggs discrediting Detective Riley's interrogation techniques to conclude that Allen had demonstrated a *Brady* violation. We are not persuaded that this additional testimony can be fairly characterized as improperly undisclosed. The transcript of Allen's confession which was available to Allen prior to his trial reveals that Detective Scaggs was present for at least a part of the interrogation.

However, because the habeas court expressly did not rely on either the lab report or Detective Scaggs additional testimony criticizing Detective Riley's interrogation techniques to reach the conclusion the Allen demonstrated *Brady* prejudice, we see no harm in the habeas court's reference to these stipulated facts in its Judgment.

**15.** The Attorney General did argue before the habeas court that Allen's drawing was not

"favorable" because it could be argued to be a drawing of the building, and not of the apartment, in which Ms. Bell lived. The Attorney General also argued that evidence that Richardson had been *successfully* hypnotized was not favorable to Allen because the prosecutor elicited evidence that Salih had been *unsuccessfully* hypnotized in Allen's trial—without said evidence having any impact on the jury's willingness to convict Allen. The Attorney General points out these same frailties in its writ petition, though in the context of the *Brady* materiality/prejudice prong, and not to argue that the evidence was not favorable to Allen. We conclude, in any event, that the fact this evidence was susceptible to an explanation that is unfavorable to Allen is immaterial. The evidence was also clearly susceptible to a favorable construction that could have benefitted Allen's defense—a fact the Attorney General does not contest.

len's trial. *Id.* at 126. The habeas court found that "the police's failure to disclose exculpatory evidence was prejudicial to [Allen] even without considering the new, non-suppressed evidence that [Allen] has raised" such that the habeas court need not "resolve the legal issue of whether [it] may also consider the new evidence in evaluating [Allen's] *Brady* claims."[16] [Judgment, p. 43].

◼ The Attorney General argues that the habeas court abused its discretion in reaching this conclusion. The Attorney General argues that the undisclosed evidence does not meet the *Brady/Kyles* materiality standard "because Allen's trial turned on his own confession rather than forensic evidence or witness testimony." [Suggestions in Support of Petition for Writ of Certiorari, p. 11]. Essentially, the Attorney General argues that "in light of Allen's confession and the evidence corroborating that confession it was an abuse of discretion to find prejudice from the failure to disclose evidence in this case." [Suggestions in Support of Petition for Writ of Certiorari, p. 3]. We do not agree. The Attorney General's argument misapprehends what is required to establish a "reasonable probability" sufficient to undermine confidence in the outcome of a trial, and thus to establish *Brady* prejudice. In addition, the Attorney General's argument fails to acknowledge the undeniable relationship between the undisclosed evidence the habeas court relied upon and the jury's willingness at trial to accept Allen's confession as reliable.

*Kyles* makes clear that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." 514 U.S. at 434, 115 S.Ct. 1555. Further, *Kyles* explains that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35, 115 S.Ct. 1555. It thus matters not that "there would still have been adequate evidence to convict even if the favorable evidence had been disclosed." *Id.* at 435 n. 8, 115 S.Ct. 1555. All that is required is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a

**16.** The Stipulated Facts included a category denoted "New Evidence" referring to stipulated evidence discovered or determined after Allen's trial but not known to the State before trial, and thus not improperly undisclosed. This new evidence included: (i) post-conviction DNA testing that eliminated Allen as the source of sperm found on Ms. Bell's vaginal swab and robe, and revealed that the sperm was consistent with that of Ms. Bell's live-in boyfriend, Watters. However, Watters could not have been the source of the type B or AB antigens and instead was the source of the "'A,' 'O,' or non-secretor" semen—semen for which Allen had not been excluded as the source at the time of trial. DNA testing has not revealed the identity of the type B or AB sperm donor, likely because those samples were fully consumed during testing at the time of trial; (ii) post-conviction testing that revealed there was no sperm or semen on the carpet cutting, anal swab, or director's chair, contrary to Crow's testimony, which testimony had been used by the State at trial to corroborate Allen's confession; (iii) Salih's sworn affidavit that she did not hear Richardson call out Ms. Bell's name, and so advised the police when they questioned her; and (iv) an affidavit from a confession expert which concluded that Allen's confession was unreliable. Though the parties stipulated to the accuracy of this "new evidence," they did not agree that the law permitted its use in determining *Brady* prejudice. The habeas court avoided the disputed legal question by making it clear that the stipulated new evidence played no part in its conclusion that *Brady* prejudice had been demonstrated.

different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555. *See also, Smith v. Cain,* —— U.S. ——, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) ("A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine [ ] confidence in the outcome of the trial.' ") (citation omitted).

The Attorney General asks us to conclude that because the confession was sufficient to support Allen's conviction and would have remained so even if discounted in its reliability by the undisclosed evidence it was an abuse of discretion to afford Allen habeas relief. This is not, however, the standard we are bound to apply. The question is not whether Allen could still have been convicted had the jury heard all of the undisclosed evidence. The question is whether the cumulative effect of the undisclosed evidence leaves us with the sense that the "likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of [Allen's] trial.' " *Smith,* —— U.S. at ——, 132 S.Ct. at 630 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555). Certainly, that is the conclusion the habeas court reached. The habeas court's explanation for its conclusion is set forth below:

> First, the undisclosed serology evidence points to the strong possibility of an unknown third party as the perpetrator (a person with Type B or AB blood), and thus directly undercuts the State's theory that Allen (who is a Type O nonsecretor) raped and killed the victim. A finding of foreign B antigens on semen or other fluids on clothing the victim wore on the morning of the attack— which could not have been deposited by the victim's consensual sex partners— was key evidence that the defense could

have used to establish that Allen could not have committed the crime.

> Likewise, the fingerprints excluding Allen would have provided the defense with further support for an argument that someone else was the perpetrator. Although there were no fingerprints matching Allen found at the scene, the exculpatory value of that fact was weakened by Hart's testimony that there were no foreign prints found at the scene at all. The State had a burden at trial to prove Allen's guilt beyond a reasonable doubt. The State's nondisclosure of the prints deprived Allen of the ability to wage a full defense and demonstrate to the jury that police had in fact found numerous foreign identifiable prints (not matching either of the home's occupants) that excluded Allen. Indeed, police even continued to compare those prints to other suspects after Allen's confession. Examined together, the B antigen finding and the fingerprint evidence constitute two categories of physical evidence present at the crime scene, both of which exclude Allen as the source, and neither of which has been identified. The defense plainly would have been able to use this evidence to suggest both categories of evidence came from an as-yet-unknown perpetrator, and not from Allen.

> Second, the undisclosed evidence directly undercuts the reliability of the confession. Allen's inaccurate drawing of the crime scene provides further evidence that Allen had no actual knowledge of the crime. Furthermore, had Allen's crime scene diagram not disappeared from the police file, it would have led the defense to discover and present the testimony of Scaggs, potentially revealing to the jury that Riley's method of interrogation created an inherent risk of pro-

ducing a false confession.[17] Likewise, the revelation that Richardson was hypnotized undermines her testimony, one of the most critical pieces of corroboration for Allen's confession. Posthypnotic testimony is unreliable and cannot be given weight in assessing the truth of Allen's confession.[18]

Ultimately, all of the undisclosed evidence would have allowed defense counsel to greatly undercut the credibility of the police investigation and of Riley in particular, a critical issue in the jury's assessment of Allen's confession. Indeed, had the undisclosed evidence come to light, the defense easily could have shown evidence that was inconsistent with the confession Riley obtained from Allen.

In short, had the police not failed to disclose the numerous exculpatory pieces of evidence, there is a "likelihood of a different result ... great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith*, 132 S.Ct. at 627, citing *Kyles*, 514 U.S. at 434 [115 S.Ct. 1555]. The undisclosed evidence went to the "the essence of the State's case" against Allen. Because its disclosure would have weakened the State's case significantly and strengthened the defense's case, the evidence was undoubtedly material. *Kyles*, 514 U.S. at 441 [115 S.Ct. 1555].

[Judgment, pgs. 69–71].

■ The habeas court's conclusion is not clearly against the logic of the circumstances then before the court and is not so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Stewart*, 313 S.W.3d at 665. We remind that the issue here is not whether Allen can be declared innocent based on the undisclosed evidence. Had all of the undisclosed evidence been heard by the jury, and Allen convicted, then the sufficiency of the evidence to convict Allen employing the proper standard of review[19] would not be subject to serious debate.

But that is neither our inquiry, nor the standard we are to apply. We are required only to determine whether the habeas court abused its discretion in concluding that there is a reasonable probability that the jury, had it heard the undisclosed evidence, could have acquitted Allen *notwithstanding* his confession. *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555 ("[A] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.").

17. By so observing, the habeas court was not suggesting that Detective Scaggs's testimony about the suspect interrogation techniques employed by Detective Riley had been improperly undisclosed in violation of *Brady*, but rather was pointing out that the lost diagram likely deprived Allen of the opportunity to learn that Detective Scaggs would so testify. *See* footnote number 14.

18. After Allen was convicted, the Missouri Supreme Court announced a per se rule of exclusion from evidence of testimony from a lay person generated by hypnosis. *Alsbach v. Bader*, 700 S.W.2d 823, 824 (Mo. banc 1985) (superceded on seemingly unrelated grounds by section 490.065, RSMo (2000), which dis-

cusses the standard for admitting expert testimony). It is not clear the extent to which this ruling in a civil case would affect the State's ability in a criminal case to elicit the testimony from Richardson which the Attorney General argues was critical to corroborating Allen's confession, should Allen be retried.

19. "When reviewing a challenge to the sufficiency of the evidence, this Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence. All evidence and inferences to the contrary are disregarded." *State v. Crawford*, 68 S.W.3d 406, 407–08 (Mo. banc 2002) (internal citation omitted).

The Eastern District noted in Allen's direct appeal, "the jury was at liberty to find that [Allen's] confession was not voluntary and reject the same, but they did not." *Allen*, 684 S.W.2d at 424. As the habeas court observed, though accepted as reliable by Allen's second jury, Allen's confession was particularly susceptible to the effect of the undisclosed evidence given Riley's leading and suggestive interrogation of Allen, the fact that Riley pushed Allen to change his answers when they were inconsistent with known facts about the crime, and the fact that much of what Allen confessed to was inconsistent with known facts about the crime.[20] As the habeas court observed, many of Allen's inconsistent answers were given *after* Allen confessed to raping and killing the victim, and thus at a point when Allen had little to gain by withholding accurate details. That, coupled with the "lack of strong evidence to corroborate the confession" lead the habeas court to conclude that Allen met his burden to demonstrate a reasonable probability of a different outcome sufficient to undermine confidence in the fairness of his trial. [Judgment, p. 74]. The habeas court cannot be said to have abused its discretion in reaching this conclusion.

## Conclusion

Allen established the gateway of cause and prejudice, thus permitting the habeas court to consider his otherwise procedurally defaulted *Brady* claim. Allen established the essential elements of a *Brady* claim, and in the process, demonstrated a

violation of his Due Process right to a fair trial. We refuse to quash the record of the habeas court.

As a result of the writ of habeas corpus, Allen's conviction of capital murder, rape, sodomy, and first degree burglary in connection with the February 4, 1982 murder of Mary Bell is vacated. As we have noted, the writ of habeas corpus did not determine guilt or innocence, and Allen remains a charged pretrial detainee released on his own recognizance and subject to a new trial. *Irvin*, 366 U.S. at 728, 81 S.Ct. 1639.

■ However, "there is authority permitting an appellate court to impose restrictions on the retrial of a defendant whose conviction has been vacated by a writ of habeas corpus." *McElwain*, 340 S.W.3d at 258 (citing *Amrine*, 102 S.W.3d at 544; *Engel*, 304 S.W.3d at 130). Given the circumstances in this case, we exercise our discretion to exert that authority. We direct that the State[21] must formally announce its intention to retry Allen within thirty (30) days of our mandate, *and* must thereafter commence to retry Allen within six (6) months (subject to extension only by virtue of continuances sought by Allen), or Allen shall be discharged from the State's custody without need of further order from this, or any other court. In the alternative, should the State announce within thirty (30) days of our mandate that it does not intend to retry Allen, Allen shall be immediately discharged from the State's custody without need of any further order from this, or any other court.[22]

---

**20.** For example, Allen confessed to the wrong time of day, appearance of the victim, what the victim was wearing, where the weapon was obtained and left behind, and how the victim was killed.

**21.** The City of St. Louis Circuit Attorney's Office represents the State's interests in connection with the charges pending against Al-

len, and is the office authorized to make this decision.

**22.** We recognize that the City of St. Louis Circuit Attorney's Office has already made such an announcement in connection with the habeas court's expressed willingness to release Allen from incarceration. However, the

If Allen is released from the State's custody by virtue of either scenario, he will no longer be a pretrial detainee as a charged suspect in the murder of Ms. Bell, and he will be immediately relieved of the conditional terms imposed on his release from incarceration by the habeas court. *Id.* at 258 n. 33.

All concur.

effect of a similar announcement if made in response to this Opinion will be to permanently discharge Allen, and not merely to permit Allen's conditional release from incarceration. We believe it appropriate, therefore, to permit the City of St. Louis Circuit Attorney's Office a final, albeit brief, opportunity to determine and announce its intentions. If the City Attorney plans to repeat its previously announced intention not to retry Allen, we would encourage it to do so as expeditiously as possible.